**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **AISHA MOOTRY,** ) | |
| ) | |
| ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | **CIVIL ACTION NO. 1:25-cv-10508** |
| **v.** ) | |
| ) | |
| **SPOTIFY USA INC.,** ) | |
| ) | |
| *Defendant.* ) | |

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S PARTIAL MOTION TO DISMISS**

---

Plaintiff Aisha Mootry ("Ms. Mootry"), by undersigned counsel, respectfully submits this Memorandum of Law in Opposition to Defendant Spotify USA Inc.'s ("Defendant" or "Company" or "Spotify") Partial Motion to Dismiss.

**<u>INTRODUCTION</u>**

For more than four years, Plaintiff Aisha Mootry, a Black woman and seasoned sales executive, served as Director of Sales at Spotify USA Inc. Compl. ¶¶ 1, 10-15. In that role, she led teams, cultivated client relationships, and drove substantial revenue for the Company. Compl. ¶¶ 14-15. In 2023 alone, Ms. Mootry led her team to generate more than $42 million in revenue, exceeding her assigned target by 36 percent. Compl. ¶ 15.

Despite her strong performance, Spotify did not treat Ms. Mootry as it treated her non-Black peers. Instead, the Company subjected her to a pattern of race-based inequity that permeated the terms and conditions of her employment. Spotify assigned her inexperienced and insubordinate direct reports, provided her with distressed and underdeveloped accounts, and imposed inflated performance expectations while affording non-Black counterparts more experienced teams,

mature portfolios, and favorable territories. Compl. ¶¶ 19-23, 26–-3. Leadership further denied her the onboarding support, guidance, and institutional resources it provided to similarly situated non-Black directors. Compl. ¶¶ 40-45.

Spotify also permitted insubordination and exclusionary conduct by Ms. Mootry's non-Black direct reports, undermining her leadership authority and impairing her ability to perform her role effectively. Compl. ¶¶ 46-64. When Ms. Mootry complained about these issues and the disparate treatment she was experiencing, Spotify failed to intervene or remedy the conduct. Compl. ¶¶ 55-68. The discriminatory treatment extended beyond internal support and resources. Spotify systematically excluded Ms. Mootry from key professional and leadership opportunities afforded to her peers. It excluded her from leadership meetings, client engagements, and networking opportunities, including a client dinner at SXSW and a Chicago directors' team dinner attended by all other directors. Compl. ¶¶ 74-76. In summer 2024, Spotify excluded Ms. Mootry from the North America Quarterly Kickoff held in New York, while allowing two non-Black directors to attend. Compl. ¶ 78. During Ad Week in New York, Ms. Mootry's team attended client dinners and networking events without inviting her. Compl. ¶ 79. These exclusions deprived Ms. Mootry of critical professional visibility and relationship-building opportunities. Compl. ¶ 80.

Ms. Mootry repeatedly raised concerns to management and Human Resources about discriminatory treatment, insubordination, and inequitable working conditions. Compl. ¶¶ 55-68, 73. Rather than investigate or remedy her complaints, Spotify suggested she consider finding another job. Compl. ¶ 67.

Less than six months after Ms. Mootry escalated her complaints, Spotify terminated her employment on January 10, 2025, citing vague and pretextual reasons while not similarly disciplining non-Black employees who were not held to the same standards. Compl. ¶¶ 82-90. This

lawsuit followed.

Spotify now seeks to dismiss most of Ms. Mootry's claims before discovery begins. Its Partial Motion to Dismiss is not a routine pleading challenge. It is an effort to strip this case of its factual core before discovery begins, foreclosing inquiry into Spotify's account assignment, exclusion, and advancement practices. Before filing an Answer and before a single interrogatory has been served, Spotify asks this Court to dismiss substantial portions of Ms. Mootry's claims, despite well-pleaded allegations of discrimination and retaliation that culminated in the termination of her employment. By attempting to import summary-judgment standards into a Rule 12(b)(6) motion, Spotify seeks a result the law does not permit. The motion asks the Court to disregard well-pleaded allegations of discrimination and retaliation, impose pleading burdens the law does not require, and resolve fact-intensive questions inappropriate for a Rule 12(b)(6) motion.

First, Ms. Mootry plausibly alleges discriminatory impact in New York. Spotify is headquartered in New York, and the discriminatory conduct she challenges deprived her of access to New York-based professional opportunities. Compl. ¶¶ 3, 78-80. Construing the NYCHRL broadly in favor of discrimination plaintiffs, Spotify's duty-station argument fails as a matter of law.

Second, Ms. Mootry engaged in protected activity when she repeatedly complained to management and Human Resources about disparate treatment and inequitable working conditions. Compl. ¶¶ 55-68, 73. The law does not require employees to invoke legal terminology to oppose discrimination. Spotify terminated her employment less than six months after she escalated these complaints, rendering causation more than plausible at this stage. Compl. ¶¶ 82-90.

Third, Spotify's timeliness argument fails. Pre-limitations conduct remains admissible as background evidence, and Ms. Mootry's hostile work environment claim is governed by the

continuing violation doctrine.

Accordingly, Spotify's motion should be denied in its entirety.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010).

Rule 8 "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegality." *Arista Records*, 604 F.3d at 120 (quoting *Twombly*, 550 U.S. at 556). The ultimate issue "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). A court's duty on a Rule 12(b)(6) motion "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010).

In employment discrimination cases specifically, this standard requires only that the complaint allege facts giving the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002). A discrimination complaint need not allege facts establishing each element of a prima facie case to survive a motion to dismiss; such a "heightened pleading standard . . . conflicts with Federal Rule of Civil Procedure 8(a)(2)." *Id.* at 512. All that is required is a "minimal inference" of

discriminatory motivation. *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015). Courts have cautioned against dismissal in employment discrimination claims at the pleading stage given the inherently fact-specific nature of the inquiry and the reality that direct evidence of discrimination is rarely available before discovery. *Swierkiewicz*, 534 U.S. at 511-512.

## ARGUMENT

### I. Ms. Mootry Has Plausibly Alleged Discriminatory Impact in New York Under Controlling Law.

Spotify argues Ms. Mootry cannot invoke the NYSHRL or NYCHRL because she worked remotely from Chicago. That argument misstates the governing standard and ignores Ms. Mootry's concrete allegations of discriminatory impact in New York.

### A. The Impact Test Focuses on Where the Discriminatory Impact is Felt— Not Residency or a Fixed Duty Station.

New York courts require only that a nonresident plaintiff plead that the discriminatory conduct had an impact in New York. *Hoffman v. Parade Publ'ns, Inc.*, 15 N.Y.3d 285, 291 (2010) (holding that nonresidents must show that alleged discriminatory conduct had an impact within New York). Specifically, the Court of Appeals emphasized that the impact test "does not exclude all nonresidents from [the laws'] protection; rather, it expands those protections to nonresidents who work in the city." *Id.* at 290. *Hoffman* dismissed the plaintiff's claims not because he was a nonresident, but because he was "neither a resident of, nor employed in, the City or State of New York" and had failed to allege any impact in New York at all. *Id.* at 292. The Court also rejected the employer's position that no nonresident could ever invoke the laws, as well as the Appellate Division's rule that any decision made at a New York employer's headquarters sufficed—finding that rule "impractical" and productive of "inconsistent and arbitrary results." *Id.* at 291. The result is a practical, fact-specific test: did the discriminatory conduct have an impact on the plaintiff within New York's geographic boundaries?

Federal courts applying the impact test have consistently held that "courts look to the location of the impact of the offensive conduct." *Salvatore v. KLM Royal Dutch Airlines*, 1999 WL 796172, at *13 (S.D.N.Y. Sept. 24, 1999). That principle was reaffirmed in *Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007): "it is the site of impact, not the place of origination, that determines where discriminatory acts occur."

Spotify's motion rests on the reading of the impact test that *Hoffman* expressly rejected. *Hoffman* held that no employer could insulate itself from the NYCHRL or NYSHRL by arguing that nonresidents categorically cannot invoke those laws and rejected any approach producing "inconsistent and arbitrary results" based solely on where the employer happened to make a formal decision. 15 N.Y.3d at 291. The controlling question is not where Ms. Mootry was permanently stationed, but where the discriminatory conduct had its impact. *Id.* at 289. Ms. Mootry's case falls squarely within the laws' protection. The motion should be denied.

**B.     Denial of New York-Based Professional Opportunities Constitutes Actionable New York Impact.**

Courts routinely find the impact requirement satisfied where discrimination affects a plaintiff's terms and conditions of employment centered in New York. *Anderson v. HotelsAB, LLC*, 2015 WL 5008771 (S.D.N.Y. Aug. 24, 2015), directly addresses this situation. There, the court held that a nonresident plaintiff plausibly alleged NYCHRL impact where discriminatory conduct denied her "the opportunity to work in New York City," finding that provided "the necessary New York City workplace nexus for her claim of a City Human Rights Law covered injury." *Id.* at *6. *Anderson* establishes that a nonresident plausibly alleges NYCHRL impact where discriminatory conduct denies her work performed in New York or professional opportunities connected to New York operations. The same principle extends to any discriminatory exclusion from New York-based professional activities. In *Regan v. Benchmark Co., LLC*, 2012

6

WL 692056, at *14 (S.D.N.Y. Mar. 1, 2012), the court found that although the plaintiff was physically located outside of New York, she satisfied the impact requirement because "all aspects of her employment were connected to the New York office."

Taken together, *Hoffman*, *Anderson*, *Int'l Healthcare*, and *Regan* establish that the examples listed in Ms. Mootry's Complaint reflecting discriminatory conduct occurring in New York are cognizable under NYSHRL and NYCHRL. The critical question is not where Ms. Mootry was formally assigned, but where the discriminatory conduct had its impact. Under any articulation of that standard, New York is the answer.

### C.    Ms. Mootry Plausibly Alleges Discriminatory Impact in New York.

Ms. Mootry alleges that Spotify excluded her from an in-person NA Quarterly Kickoff held in New York, depriving her of access to a New York-based professional forum central to her role. Compl. ¶ 78. Ms. Mootry further alleges that while in New York for Ad Week, Spotify excluded her from client dinners, happy hours, and networking events attended by her colleagues. Compl. ¶¶ 74-79. These New York-based exclusions denied Ms. Mootry access to New York clients, industry relationships, and professional opportunities essential to her advancement. These are precisely the kinds of New York-centered professional opportunities that New York's human Rights Laws are designed to protect.

Courts applying the impact test have articulated a two-prong framework: impact is established where "(1) the discriminatory act occurred in New York or (2) the original injury was experienced at [the plaintiff's] New York workplace." *Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 624 (E.D.N.Y. 2012). Ms. Mootry satisfies both prongs. Under the first prong, the discriminatory acts themselves—Spotify's exclusion of Ms. Mootry from the NA Quarterly Kickoff and from client dinners and networking events at Ad Week—occurred in New York, while Ms. Mootry was

physically present in New York and engaged in professional work. Under the second prong, the professional injury, including deprivation of client relationships, industry access, and career advancement opportunities, was experienced within New York's geographic boundaries, at New York-based industry events. *See Anderson*, 2015 WL 5008771, at *6; *Int'l Healthcare*, 470 F. Supp. 2d at 357.

Spotify attempts to minimize these allegations as isolated events. But the impact test does not turn on frequency. It turns on whether discriminatory conduct deprived Ms. Mootry of New York-based workplace opportunities. She plausibly alleges it did. At the pleading stage, that is more than sufficient.

## II.     **Ms. Mootry Plausibly Alleged Protected Activity and Causal Connection Related to Her Retaliation Claims.**

Spotify's attempt to dismiss Ms. Mootry's retaliation claims fails as a matter of law at each element. Spotify moves to dismiss Count Four, Ms. Mootry's retaliation claims under Title VII and Section 1981. Spotify advances two arguments, neither of which withstands scrutiny. First, it contends that Ms. Mootry's internal complaints did not constitute protected activity because they were not explicitly framed using the language race discrimination. Second, it argues that even if her 2022 complaints to her supervisor were protected activity, the approximately two-year gap between those complaints and her January 2025 termination defeats causation and the 2024 HR complaints do not qualify as protected activity at all. Both arguments fail. Ms. Mootry's complaints—in 2022 and again in 2024—explicitly invoked disparate treatment relative to her non-Black counterparts. Each constitutes protected activity. And Ms. Mootry did not make a single complaint and go silent for two years; she escalated her complaints to Human Resources in 2024, and Spotify terminated her less than six months later.

To state a retaliation claim under Title VII, Section 1981, or the NYCHRL, a plaintiff must

plausibly allege (1) participation in protected activity, (2) the defendant's knowledge of that activity, (3) an adverse employment action, and (4) a causal connection between the protected activity and the adverse action. *Littlejohn*, 795 F.3d at 315-16. Ms. Mootry satisfies each element. Spotify does not dispute elements (2) and (3). Its motion rests entirely on protected activity and causal connection and each challenge fails.

### A.    Ms. Mootry's Complaints Constituted Protected Activity.

A retaliation plaintiff need not explicitly invoke the words "race," "discrimination," or any particular statutory provision to engage in protected activity. *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007).  The test is whether she had "a good faith, reasonable belief" that she was opposing an employment practice made unlawful by anti-discrimination law. *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 466 (S.D.N.Y. 2006) (quoting *Knight v. City of New York*, 303 F. Supp. 2d 485, 496 (S.D.N.Y. 2004)).

Context here leaves no room for doubt. Ms. Mootry is a Black woman. The complaint expressly alleges that she complained to Spotify that her supervisors, including Mr. Mikitka, were "treating her adversely compared to her non-Black counterparts and holding Ms. Mootry to disproportionate expectations compared to her non-Black counterparts." Compl. ¶ 140. That language speaks directly to race: it connects the adverse treatment directly to race. A complaint from a Black employee identifying disparate treatment by reference to "non-Black counterparts" puts any reasonable employer on notice that a race discrimination complaint has been lodged. *Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C.*, 716 F.3d 10, _ (2013) (emphasizing that while specific words like "discrimination" are not required, the substance and context of the complaint must suggest that the complained-of activity relates to discriminatory conduct based on a protected class).

9

Ms. Mootry also engaged in protected activity when she complained to Mr. Rotunno, Ms. Nelson, Ms. Mendes, Mr. Barco, and Ms. Piper about the inequitable allocation of business accounts in 2023 and 2024. Compl. ¶ 141. Read in context—as it must be on a motion to dismiss— a complaint about inequitable allocation of accounts by a Black employee who has already complained about being held to disproportionate expectations compared to non-Black counterparts is unmistakably race-based protected activity.

Spotify's reliance on *Roman-Malone v. City of New York*, 2013 WL 3835117 (S.D.N.Y. July 25, 2013), and *Batiste v. City University of New York*, 2017 WL 2912525 (S.D.N.Y. July 7, 2017), is misplaced. Those cases involved generic complaints about management style or workload with no reference—express or implied—to race or to disparate treatment compared to non-Black counterparts. Ms. Mootry's complaint explicitly noted workplace inequities based on race.

Ms. Mootry also lodged a formal HR complaint. Compl. ¶¶ 55, 75, 140-141. Spotify's assertion that even a formal HR complaint failed to constitute protected activity is not a serious argument at the pleading stage.

Spotify also cites *Talwar v. Staten Island University Hospital*, 610 F. App'x 28 (2d Cir. 2015), and *Richards v. New York City Health + Hospitals Corp.*, for the requirement that a complaint must connect to a protected characteristic. Ms. Mootry does not dispute this. She contends—and the complaint alleges—that her complaints made that connection through their content and context. *Talwar* and *Richards* require a connection, not magic words. The connection is present here.

### B. Spotify's Retaliation Extended Well Beyond Ms. Mootry's Termination.

Spotify asserts that the termination is the only adverse action Ms. Mootry connects to her

10

protected activity. That assertion is wrong as a matter of both fact and law. The legal standard for adverse action in the retaliation context is far more plaintiff-friendly than Spotify's framing suggests. An adverse retaliatory action is any action that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). That standard covers a broad range of employer conduct, *id.* at 73 and is "not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. Under the NYCHRL, the standard is broader still: any action "reasonably likely to deter a person from engaging in protected activity" qualifies. N.Y.C. Admin. Code § 8-107(7). The complaint alleges at least three adverse retaliatory actions that post-date Ms. Mootry's protected complaints and independently satisfy *Burlington Northern*'s standard.

*First*, when Ms. Mootry raised her discrimination concerns with Spotify's Human Resources department, HR's response was to tell her to find another job. Compl. ¶ 55. That response is itself an actionable adverse action: it signals to a complaining employee that her protected complaints will not be investigated or remedied and that her continued employment is imperiled because she complained. A reasonable employee receiving that message would be deterred from making further discrimination complaints, which is exactly the harm *Burlington Northern* was designed to prevent. 548 U.S. at 68.

*Second*, in Summer 2024, after Ms. Mootry had lodged her complaints with HR, Spotify excluded her from the NA Quarterly Kickoff in New York, an in-person meeting that Director-level participation was standard practice to attend. Compl. ¶ 78. Two non-Black Directors traveled with Mr. Rotunno to the New York meeting; Ms. Mootry was left in Chicago. Exclusion from a leadership forum that is standard for one's role, on the heels of protected complaints, is precisely

the type of "significant change in working conditions" that *Burlington Northern* recognizes as materially adverse. 548 U.S. at 70–71.

*Third*, in October 2024—again after the protected HR escalation—Spotify excluded Ms. Mootry from client dinners, happy hours, and networking events attended by her entire team during Ad Week in New York. Compl. ¶ 79. Professional isolation from client-facing events and industry networking directly damages a sales leader's ability to perform, advance, and build the relationships her role demands. These exclusions are not trivial slights; they are the kind of workplace marginalization that the Second Circuit has recognized deters protected activity and harms career progression.

Taken together, these post-complaint actions: HR's dismissive "find another job" response, exclusion from the New York Quarterly Kickoff, and systematic exclusion from Ad Week client and networking events paint a coherent picture of escalating retaliation culminating in Spotify's termination of Ms. Mootry's employment. At the pleading stage, Ms. Mootry need not prove that each exclusion was retaliatory; she need only allege facts from which retaliatory motive may be plausibly inferred. She has done far more than that at the pleading stage.

### C.    Ms. Mootry Has Adequately Alleged Causal Connection.

Spotify's causation argument posits that Ms. Mootry's only potentially protected activity was her 2022 complaint to her supervisor, and that the approximately two-year gap between that complaint and her January 2025 termination is too attenuated to support a causal inference. That argument fails for two independent reasons.

*First*, Spotify's framing ignores the 2024 HR complaints entirely. As established in Subheading A above, Ms. Mootry's 2024 HR complaints—which explicitly invoked disparate treatment relative to her non-Black counterparts—constitute protected activity in their own right.

12

Compl. ¶¶ 55, 140–141. Those complaints preceded her January 10, 2025 termination by less than six months. Compl. ¶ 143. The Second Circuit has found gaps of similar length sufficient to support a causation inference at the pleading stage, particularly when combined with a pattern of retaliatory escalation. *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013). Spotify cannot deny that the 2024 HR complaints constitute protected activity under Prong A while simultaneously treating them as legally nonexistent for purposes of causation. The Court must accept all of Ms. Mootry's factual allegations as true—including that her 2024 complaints were race-based—and on that basis alone, causation is not merely plausible; it is the natural inference from the pleaded facts.

*Second*, even looking to the 2022 complaint alone, Ms. Mootry's claims do not rest on temporal proximity. A plaintiff may establish causation through circumstantial evidence of a retaliatory pattern, not only by proximity in time. *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 324 (N.D.N.Y. 2013) (citing cases). Courts in this Circuit recognize that a pattern of escalating adverse treatment following repeated complaints independently supports an inference of retaliatory motive. *See Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 189-90 (S.D.N.Y. 2024) (citing *Colon v. N.Y.C. Hous. Auth.*, 2021 WL 2159758, at *13 (S.D.N.Y. May 26, 2021)). From 2022 through her termination, Ms. Mootry's complaints were met not with remediation but with escalating marginalization: worsening account assignments, exclusion from professional events, HR's directive to find another job, and ultimately termination. That trajectory is retaliatory evidence, independent of any single timestamp. As the Second Circuit observed in *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir. 1989), "employers are rarely so cooperative as to include a notation that their actions are motivated by factors expressly forbidden by law." The pattern speaks for itself—and at the pleading stage, it is more than enough. At minimum, these allegations readily satisfy the plausibility standard and entitle Ms. Mootry to proceed to discovery

III.    **Spotify's Arguments Regarding Timeliness Fail.**

Spotify moves to strike from this case all conduct predating April 18, 2024—the date 300 days before Ms. Mootry filed her EEOC charge. Spotify contends that any discrete discriminatory act prior to that date is time-barred under Title VII and must be dismissed as an independent basis for liability. On that theory, Spotify would excise from the case the bulk of the discriminatory conduct Ms. Mootry experienced from 2021 through early 2024: the inequitable account assignments, the denial of support afforded non-Black peers, the exclusion from professional gatherings, and the pattern of workplace marginalization orchestrated by Mr. Mikitka and Mr. Rotunno. The argument fails on multiple grounds.

A.    **Time-Barred Discrete Acts Remain Admissible as Background Evidence.**

Spotify argues that pre-April 18, 2024 conduct must be dismissed entirely and may play no role in this case. That argument goes well beyond what Title VII's limitations period permits, and the Supreme Court has said so directly.

The Supreme Court's decision in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), resolves this point directly. The Court held that although "[d]iscrete discriminatory acts are not actionable if time barred," courts "may . . . consider the prior acts as background evidence in support of a timely claim." *Id.* at 113. Ms. Mootry does not seek to impose direct liability for pre-April 18, 2024 acts as independent bases for Title VII discrimination. She preserves her right—expressly recognized by *Morgan*—to use pre-limitations conduct as background evidence to contextualize and corroborate the discriminatory nature of Spotify's timely conduct, including her January 2025 termination. To the extent Spotify's motion seeks a broader ruling excluding pre-limitations evidence from the case entirely, it asks for more than *Morgan* allows.

14

### B. The Continuing Violation Doctrine Preserves Ms. Mootry's Hostile Work Environment Claim.

Spotify next argues that Count Three—Ms. Mootry's hostile work environment claim—is also time-barred because the conduct underlying it began years before the limitations period. That argument misunderstands the legal standard governing hostile work environment claims, which the Supreme Court has recognized as categorically different from the rule applicable to discrete acts.

But *Morgan* also forecloses Spotify's timeliness argument as to the hostile work environment claim. The Court held that "[h]ostile environment claims are different in kind from discrete acts" and that so long as "any act contributing to that hostile environment takes place within the statutory time period," the Court may consider "the entire time period of the hostile environment." *Id.* at 117. Ms. Mootry's January 2025 termination is unquestionably within the limitations period. It anchors the hostile work environment claim, and the entire course of racial discrimination Ms. Mootry experienced from 2021 through 2024—the unequal workload, the promotion denials, the exclusions, the derogatory treatment—may be considered in assessing the nature and severity of that environment. *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 260-61 (2d Cir. 2023).

## CONCLUSION

Spotify's Partial Motion to Dismiss does not seek dismissal of Ms. Mootry's claims in their entirety, and all of Ms. Mootry's claims should proceed to discovery. The Complaint plausibly alleges race discrimination and retaliation under Section 1981, Title VII, the NYSHRL, and the NYCHRL, and easily satisfies the liberal pleading standards of Rule 8.

Spotify's timeliness arguments fail because even where certain discrete acts fall outside the applicable limitations period as standalone claims, those allegations are properly pleaded as

background evidence supporting Ms. Mootry's timely claims. Spotify's effort to excise large portions of the factual narrative at the pleading stage is inconsistent with controlling precedent and should be rejected.

Spotify's remaining arguments improperly attempt to impose heightened pleading requirements by demanding that Ms. Mootry establish a fixed duty station in New York, prove her complaints carried an explicit discrimination label, and demonstrate causation without the benefit of any discovery into Spotify's own records and decision-making. The law requires none of this at the pleading stage.

Accordingly, the Court should deny Defendant Spotify USA Inc.'s Partial Motion to Dismiss in its entirety. In the alternative, should the Court determine that any aspect of the Complaint is deficient, Ms. Mootry respectfully requests leave to amend to cure any such deficiency.

Dated: February 25, 2026

Respectfully submitted,

*/s/ Melissa Washington*
Melissa Washington, Esq.
Desiree Langley, Esq.
The Washington Law Firm, PLLC
260 Madison Avenue, 8th Floor
New York, New York 10016
Tel: (646) 823-1655
Fax: (646) 400-0614
mw@washingtonfirmpllc.com
dl@washingtonfirmpllc.com

*Counsel for Plaintiff Aisha Mootry*

16

## **WORD LIMIT CERTIFICATION**

Pursuant to this Court's Individual Practices and Local Civil Rule 7.1, the undersigned counsel certifies that this memorandum of law contains 4,501 words.

Dated: February 25, 2026

*/s/ Melissa Washington*
Melissa Washington