UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                           :

AISHA MOOTRY,                         :

                Plaintiff,        :

       -v-                   :

SPOTIFY USA INC.,              :

              Defendant.      :

                           :
------------------------------------------------------------------------X

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED:___7/8/2026___ |

25-cv-10508 (LJL)

OPINION AND ORDER

LEWIS J.  LIMAN, United States District Judge:

Plaintiff Aisha Mootry ("Plaintiff") brings this action against her former employer, Defendant Spotify USA Inc. ("Spotify").  Plaintiff asserts that Spotify discriminated against her on the basis of her race, created a hostile work environment, and then retaliated against her for speaking out about the discriminatory conduct, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1); Section 1981 of the Civil Rights Act of 1866 ("Section 1981"), 42 U.S.C. § 1981; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107.  Spotify moves, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to partially dismiss the complaint against it for lack of subject matter jurisdiction and failure to state a claim of relief.  Spotify also moves to dismiss Plaintiff's Title VII disparate treatment claim to the extent it is predicated on actions that fall outside the applicable statute of limitations.  Dkt. No. 14.

For the following reasons, the motion to dismiss is granted.

**BACKGROUND**

The Court accepts the well-pleaded allegations of Plaintiff's complaint as true for the purposes of this motion.

Spotify is a digital media service corporation with its principal place of business in New York, New York.  Dkt. No. 1 (the "Complaint" or "Compl.") ¶ 3.

Plaintiff is an individual and resident of Illinois who identifies as a Black woman.  *Id.* ¶¶ 2, 10.  Plaintiff was employed by Spotify from July 20, 2020 until January 10, 2025.  *Id.* ¶ 2. At all times relevant to the complaint, Plaintiff primarily performed work for Spotify in Chicago, Illinois.  *Id.*  Plaintiff was one of only three Black employees in Spotify's Chicago office.  *Id.* ¶ 16.

Spotify hired Plaintiff as a contractor in July 2020 under the supervision of Director of Sales, Penny Schwartz ("Schwartz") and US Head of Sales, Ann Piper ("Piper").  *Id.* ¶ 11. Plaintiff immediately displayed strong performance.  *Id.* ¶ 12.  Within her first ninety days as a contractor, Plaintiff authored proposals that led to the closing of an approximately $90 million deal.  *Id.*  Spotify hired Plaintiff as a full-time Director of Sales less than one year later on March 1, 2021.  *Id.* ¶¶ 11–13.In her role as Director of Sales, Plaintiff successfully managed her portfolio and led her team to generate over $42 million in revenue, 36% above her target.  *Id.* ¶¶ 14–15.

Shortly after Spotify elevated Plaintiff to the full-time role of Director of Sales, Plaintiff alleges Spotify began subjecting Plaintiff to discriminatory treatment and adverse employment conditions as compared to her non-Black counterparts.  *Id.* ¶ 17.

I.      **Heightened Performance Standards and Inequitable Access to Support and Opportunities**

Plaintiff alleges that her supervisor, Jeff Mikitka ("Mikitka"), imposed a different set of terms and conditions on Black employees and afforded non-Black employees more experienced staffing support and more profitable sales territories. *Id*. ¶ 18. Spotify assigned Plaintiff a team of inexperienced, poor performing, and consistently insubordinate support staff. *Id*. ¶ 19. By contrast, Spotify assigned Hillary Greene ("Greene"), a non-Black Director of Sales in Dallas, Texas, a high performing team with significantly more experience than the individuals assigned to Plaintiff. *Id*. Spotify also assigned Plaintiff more junior and distressed accounts and smaller, less profitable sales territories than Greene. *Id*. ¶ 20. While Greene was assigned a portfolio of mature accounts, Spotify assigned Plaintiff a significantly more challenging workload comprised of underdeveloped accounts, placing her at a distinct disadvantage in achieving her performance metrics. *Id*. ¶ 21.

Despite these significant encumbrances, Plaintiff surpassed her revenue goals in 2023, generating 36% more revenue than anticipated. *Id*. ¶ 23. Mikitka commended Plaintiff's performance and leadership in her "2021 [sic] year-end review," where he described Plaintiff as "resourceful," "charismatic," "an honest communicator," and someone who "led by example." *Id*. ¶ 24.

Following Spotify's restructuring in April of 2024, Plaintiff transitioned to the Consumer Packaged Goods ("CPG") group. *Id*. ¶ 25. In the CPG group, Plaintiff reported to Bryan Rotunno ("Rotunno"). Rotunno assigned Plaintiff underdeveloped and more challenging business accounts while assigning Plaintiff's non-Black counterpart, Zach Rosenow ("Rosenow"), a robust portfolio consisting of mature, well-developed business accounts which required significantly less effort to manage and grow. *Id*. ¶ 26. Plaintiff was subjected to

heightened performance expectations notwithstanding significant market challenges at the time, including sales volume declines, increased cost of goods, and marketing budget cuts, industry wide. *Id*. ¶ 27. Plaintiff was expected to meet an inflated target under far less favorable conditions as compared to Rosenow. *Id*.

Spotify implemented a joint goal setting scheme which tied the revenue generated by Plaintiff to that generated by Rosenow. *Id*. ¶ 28. Spotify required Plaintiff and Rosenow to divide a combined CPG revenue target. *Id*. This joint goal setting scheme was inherently inequitable because Plaintiff was required to meet the same revenue metrics as Rosenow despite managing a portfolio of less lucrative accounts, being supported by a less experienced team, and operating in a sales category facing numerous market challenges to which Rosenow was not subject. *Id*. Plaintiff explained to Rotunno that the arrangement would disproportionately disadvantage her and her team as compared to Rosenow. *Id*. ¶ 29. Rotunno dismissed Plaintiff's concerns and assured her that Rosenow would likely be "fair" about the arrangement. *Id*. Plaintiff alleges the inequitable joint goal setting arrangement imposed by Spotify resulted in Plaintiff and her team missing the goal for Q2 2024 by roughly 17%, while Rosenow's team achieved 96% of his team's more attainable goal. *Id*. ¶ 30.

For the remainder of 2024, Rotunno continued to subject Plaintiff to higher performance expectations than her non-Black counterparts. *Id*. ¶ 31. In Q3 2024, Rotunno assigned Rosenow a low revenue target below market potential, as demonstrated by the fact that his team met his goal within the first week of Q3. *Id*. ¶ 32. By contrast, Rotunno assigned Plaintiff significantly higher revenue goals for Q3 and Q4 2024: over $5 million more than her projections of what was achievable. *Id*. ¶ 33. In Q4 2024, Plaintiff's team missed their revenue target by roughly 17%, while Rosenow's team exceeded their goal by nearly the same percentage. *Id*. ¶ 34.

4

Rotunno also took one of Plaintiff's most successful accounts, Sazerac, away from her and assigned it to Rosenow. *Id*. ¶ 36. During her tenure, Plaintiff and her team grew the Sazerac account from $600,000 to nearly $2.4 million. *Id*. ¶ 37. Knowing the reassignment of this account would dramatically decrease her portfolio's revenue potential, Plaintiff implored Rotunno to reconsider the transfer, but he ignored her request and finalized the transfer. *Id*. ¶ 38.

Plaintiff contends that Spotify's more favorable treatment of her non-Black counterparts was not isolated to Rosenow. *Id*. ¶ 39. In October 2024, Plaintiff discovered that Rotunno was actively providing significant guidance and support to Matthrew Babcock ("Babcock"), another non-Black Director of Sales. *Id*. Rotunno gave Babcock in-depth onboarding, in-person meetings, meals, and out-of-town client visits, all aimed to help Babcock transition smoothly into his role. *Id*. ¶ 40. Rotunno also enlisted the former Director of Quick Service Restaurants, Shayne Koch ("Koch"), to assist with Babcock's training and onboarding. *Id*. Rotunno withheld these same resources and guidance from Plaintiff, even though Rotunno had formerly managed her team and knew Plaintiff was leading a new category and brand team that required strategic relationship building. *Id*. ¶ 41. Instead, Plaintiff's onboarding consisted merely of virtual, infrequent meetings that lacked meaningful or particularized instruction. *Id*. ¶ 42. The only follow-up Rotunno provided was a vague email listing contract names, many of whom had no direct control over revenue or were already assigned to other sellers. *Id*.

In October 2024, Plaintiff attended a meeting with Rotunno and saw a detailed whiteboard breakdown outlining how the Director of Sales should engage with key accounts— guidance that Rotunno provided to Babcock but never offered to Plaintiff. *Id*. ¶ 43.

## II.    Repeated Insubordination

Plaintiff alleges that from the outset of her tenure at Spotify, her non-Black direct reports challenged her "reputation" as a leader within Spotify. *Id*. ¶ 46. Despite Plaintiff's repeated

complaints about her team's insubordination and underperformance, Spotify disregarded Plaintiff's complaints, leaving her without recourse and undermining her authority. *Id.* ¶ 47.

Plaintiff supervised a team of staff members including Christine Snyder ("Snyder") and Jane Brennan ("Brennan"), both non-Black women. *Id.* ¶ 48. Within Plaintiff's first six months of employment, Snyder and Brennan were both openly insubordinate and frequently disregarded Plaintiff's directives, which Plaintiff alleges impeded her ability to drive revenue and manage her client portfolio. *Id.* ¶¶ 48, 50. Snyder deliberately excluded Plaintiff from key client meetings and routinely omitted crucial details from her weekly reports, despite meeting with Plaintiff one-on-one. *Id.* ¶ 51. When Plaintiff attempted to support Snyder in improving her performance and complying with Spotify's companywide sales mandates, Snyder dismissed Plaintiff's guidance and responded in a dismissive tone. *Id.* Plaintiff never witnessed Snyder, or her other direct reports, speak to non-Black Directors in such a condescending manner. *Id.* ¶ 52.

Similarly, Brennan openly disregarded Spotify protocols and Plaintiff's direct instruction by continuing to send lengthy, data-heavy emails to clients instead of using the company-wide presentation-style proposal framework. *Id.* ¶ 53. Plaintiff alleges that non-Black Directors, such as Mikitka and Greene, did not face this level of insubordination when enforcing the same company policies. *Id.* ¶ 54.

In approximately March 2022, Graden Levine ("Levine"), a non-Black colleague who Plaintiff alleges consistently engaged in insubordinate and exclusionary behavior, uninvited Plaintiff from a client meeting. *Id.* ¶ 55. Plaintiff reported this incident to Spotify's Human Resources ("HR") Specialist Vida Barco ("Barco"). *Id.*

In August 2023, Plaintiff complained to Cori Nelson ("Nelson") in Spotify's HR department about Snyder and Brennan's insubordination. *Id.* ¶ 56. Nelson did nothing to ensure

that Plaintiff's direct reports respected her authority and heeded her directives as their supervisor. *Id*.

After Plaintiff transitioned to the CPG group, she had five direct reports who continued this pattern of unaddressed insubordination. *Id*. ¶ 58. Although she had a record of success at Spotify, her new reports were resistant to her leadership from the outset as a result of a negative rumor mill Spotify allowed to fester regarding Plaintiff's leadership capacity. *Id*. Plaintiff communicated these concerns to Rotunno early on, and he admitted the new CPG team had reservations about working with Plaintiff based on rumors that Plaintiff was difficult to work with. *Id*. ¶ 59. Plaintiff believes these rumors were based on racial stereotypes that Black women are "angry." *Id*.

For example, Allison Casper ("Casper"), a non-Black direct report of Plaintiff, actively undermined her leadership by holding a meeting with other sellers advising them to "not go along with whatever [Plaintiff] said and speak out in our first in person team meeting." *Id*. ¶ 60. Plaintiff promptly escalated this conduct to Rotunno in June 2024, but he did nothing to intervene. *Id*. Randi Boublis ("Boublis"), another non-Black direct report, intentionally excluded Plaintiff from client meetings and also refused to inform her about important client and account information. *Id*. ¶ 61. Plaintiff raised these issues to Rotunno in June 2024, and he failed to intervene. *Id*. Rotunno instead held biweekly meetings with Casper, excluded Plaintiff from conversations that directly impacted her team, and refused to update Plaintiff after the meetings. *Id*. ¶ 62.

Plaintiff raised her complaint about her team dynamics to Piper, the US Head of Sales, noting that Rotunno refused to support her, despite her repeated requests. *Id*. ¶ 65. Piper confirmed she would follow up with Rotunno, but Plaintiff never witnessed any improvement to

the team dynamic. *Id*. In October 2024, Plaintiff further escalated her complaints regarding her team's insubordination to Nelson, an HR representative. *Id*. ¶ 66. Nelson dismissed Plaintiff's complaint outright and instead suggested that Plaintiff should consider finding another job. *Id*. ¶ 67.

### III.    Exclusion from Business Development Opportunities and Leadership Decisions

In Spring 2022, after Spotify requested increased in-office attendance, Plaintiff observed that non-Black Sales Directors and sellers deliberately ignored her and the only other Black employee on her team when they were in the office. *Id*. ¶ 70. Meanwhile, Plaintiff's non-Black colleagues openly engaged and communicated with one another in the office and by comparison, treated Plaintiff and her Black colleagues as though they were invisible. *Id*. ¶ 71. Plaintiff shared with then-manager Caroline Mendes ("Mendes") that Plaintiff's non-Black colleagues routinely ignored her and other Black employees, creating a hostile and isolating work environment. *Id*. ¶ 73. In that conversation with Mendes, Plaintiff specifically referenced race and microaggressions. *Id*.

In March 2023, Rotunno excluded Plaintiff and another Black peer from meetings with other sales leaders, including a client dinner at the SXSW Conference, instead inviting Plaintiff's non-Black counterparts to attend. *Id*. ¶ 74. Plaintiff promptly notified Mendes about the exclusion, noting that she believed it was intentional and motivated by race. *Id*. ¶ 75.

In April 2023, Koch excluded Plaintiff from a team dinner comprised of Directors in the Chicago office. *Id*. ¶ 76. All non-Black directors in the Company's Chicago office were invited, but Plaintiff was not invited even though she was at the same seniority level as all the other attendees and working in the same small office. *Id*.

In March 2024, Rosenow excluded Plaintiff from a senior leadership meeting with the Ferrara/Ferrero account.  *Id*. ¶ 77.  Rosenow included Casper, Plaintiff's less senior direct report, but excluded Plaintiff from the meeting.  *Id*.

In Summer 2024, Plaintiff was excluded from the NA Quarterly Kickoff in person in New York, where Director participation was standard practice.  *Id*. ¶ 78.  Instead, two non-Black Directors traveled with Rotunno to the meeting in New York, leaving Plaintiff in Chicago.  *Id*. In October 2024, Plaintiff attended Ad Week in New York for separately scheduled meetings and later discovered that her team had excluded her from client dinners, happy hours, and networking events that took place while she was in New York.  *Id*. ¶ 79.

## IV.    Termination of Employment

On January 10, 2025, Rotunno met with Plaintiff and Jamie Peretz ("Peretz"), a non-Black woman from Spotify's HR department.  *Id*. ¶ 82.  Rotunno told Plaintiff that despite her efforts to lead her team and improve her team's performance, "it just wasn't working," and Spotify had decided to "do what's best for the team" by terminating her employment.  *Id*. ¶ 83. Plaintiff claims that Spotify's reasoning was vague and pretextual and concedes that Plaintiff was not terminated because of her performance.  *Id*. ¶ 84.  Rather, Plaintiff alleges that she was terminated by Spotify because of her race.  *Id*. ¶ 85.

**PROCEDURAL HISTORY**

Plaintiff filed a charge of race-based discrimination and retaliation with the United States Equal Employment Opportunity Commission ("EEOC") on February 12, 2025.  *Id*. ¶ 8.  After more than 180 days, Plaintiff received a Notice of Right to Sue from the EEOC on December 16, 2025.  *Id*. ¶ 9.

Plaintiff initiated this action by complaint filed on December 18, 2025.  The complaint alleges five causes of action: (1) race discrimination in violation of Section 1981 and Title VII

9

("Count One"); (2) race discrimination in violation of NYSHRL and NYCHRL ("Count Two"); (3) racially hostile work environment in violation of NYCHRL ("Count Three"); (4) retaliation in violation of Section 1981 and Title VII ("Count Four"); and (5) retaliation in violation of NYSHRL and NYCHRL ("Count Five").  *Id* at 16–24.

On February 11, 2026, Spotify filed a partial motion to dismiss the complaint for (1) lack of subject matter jurisdiction as to each of Plaintiff's NYSHRL and NYCHRL claims (Counts Two, Three, and Five) and (2) failure to state a claim as to Plaintiff's retaliation claims under Section 1981, Title VII, NYSHRL, and NYCHRL (Counts Four and Five).  Dkt. Nos. 14–15. Spotify also moved to dismiss Plaintiff's Title VII disparate treatment claim (Count One) to the extent it is predicated on actions that fall outside the applicable statute of limitations.  *Id*.

Plaintiff filed a memorandum of law in opposition to the motion to dismiss on February 25, 2026.  Dkt. No. 17.  Spotify filed a reply memorandum of law in support of the motion to dismiss on March 4, 2026.  Dkt. No. 21.

## DISCUSSION

### I.    NYSHRL and NYCHRL Claims

Plaintiff's second, third, and fifth claims for relief allege violations of the NYSHRL and NYCHRL.  In order for a non-resident of New York City or New York State to state a claim under those statutes, a plaintiff must plead that the alleged discriminatory conduct had an impact within those respective boundaries.  *See Hoffman v. Parade Publ'ns*, 933 N.E.2d 744 (N.Y. 2010).

### A.    The Impact Test is an Element of the Claim

Spotify brings its motion to dismiss the New York state law claims under Federal Rule of Civil Procedure 12(b)(1), pursuant to which a claim may be dismissed for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  There is a division of authority in this Circuit whether

challenges to the territorial application of the NYSRHL and NYCHRL following *Hoffman* raise

a question of subject matter jurisdiction or whether a plaintiff has fulfilled an element necessary

to state a claim. *See Smith v. Vera Inst. of Just., Inc.*, 2023 WL 11879682, at *8 n.11 (E.D.N.Y.

Aug. 11, 2023) (cataloguing the split); *see also Schaffer v. GeneDx, LLC*, 2026 WL 265338, at

*19 n.12 (S.D.N.Y. Jan. 30, 2026) (same).[1]

   Whether the necessity of a New York impact defines the subject matter jurisdiction of the

Court or the scope of the underlying statute is consequential. "[C]ourts, including th[e Supreme]

Court, have an independent obligation to determine whether subject-matter jurisdiction exists,

even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514

(2006) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). If the territorial

reach of the NYSHRL and NYCHRL is jurisdictional, it would therefore be incumbent on courts

to raise the question independently with respect to every complaint containing allegations of a

violation of the NYSHRL and NYCHRL. Moreover, "subject-matter jurisdiction, because it

involves a court's power to hear a case, can never be forfeited or waived." *Id*. (quoting *United

States v. Cotton*, 535 U.S. 625, 630 (2002)). Even if the defendant were not to raise questions

regarding the reach of the NYSHRL and NYCHRL, the Court itself would have to dismiss

---

[1] Several courts in this Circuit have addressed challenges to the extraterritorial application of the NYSHRL and NYCHRL as raising a question of subject matter jurisdiction. *See Meilus v. Rest. Opportunities Ctr. United, Inc.*, 2021 WL 4868557, at *1, 4 (S.D.N.Y. Oct. 15, 2021); *Kraiem v. JonesTrading Institutional Servs. LLC*, 492 F. Supp. 3d 184, 199 (S.D.N.Y. 2020); *Pedroza v. Ralph Lauren Corp.*, 2020 WL 4273988, at *1 (S.D.N.Y. July 24, 2020). Other courts have viewed the application of New York State law as raising a question of the scope of the NYSHRL and NYCHRL and thus of whether the allegations state a claim for relief under those statutes. *See Syeed v. Bloomberg L.P.*, 568 F. Supp.3d 314 (S.D.N.Y. 2012), *vacated and remanded on other grounds*, 2024 WL 2813563 (2d Cir. June 3, 2024); *Downey v. Adloox Inc.*, 238 F. Supp. 3d 514, 519 n.2, 524 (S.D.N.Y. 2017).

11

NYSHRL or NYCHRL claims (even on appeal) if the plaintiff failed to plead and prove sufficient facts to establish that the law applied to the conduct of which the plaintiff complained.

Additionally, and significantly for purposes here, on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the defendant may "proffer[] evidence beyond the [p]leading," and, if so, the plaintiff must "come forward with evidence of their own to controvert that presented by the defendant," *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (quoting *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)), and "no presumptive truthfulness [will] attac[h] to the complaint's jurisdictional allegations." *Guadagno v. Wallack Ader Levithan Assocs.*, 932 F. Supp. 94, 95 (S.D.N.Y. 1996); *see Arbaugh*, 546 U.S. at 514 (citing 5B C. Wright & A. Miller, Federal Practice and Procedure § 1350, pp. 243–49 (3d ed. 2004); 2 J. Moore et al., Moore's Federal Practice § 12.30[3], pp. 12–37 to 12–38 (3d ed. 2005)).  Defendants could submit affidavits addressing where the impact of the discriminatory conduct was felt, and if the plaintiff was unable to controvert those facts, the Court would have to dismiss the complaint even if plaintiff's allegations were well-pled and potentially, even if the plaintiff did not have the opportunity to take discovery to establish the truth of those allegations.

By contrast, the Court has no independent obligation to assure itself that a plaintiff has in fact stated a claim upon which relief can be granted; a defendant can waive the defense of failure to state a claim.  Fed. R. Civ. P. 12(h).  Moreover, a defendant is not permitted to proffer evidence from outside the pleadings on a motion to dismiss for failure to state a claim.  *See Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013).

Spotify's argument that Plaintiff's claims should be dismissed because they lack the requisite nexus to New York and New York City is best understood to challenge the sufficiency

12

of Plaintiff's allegations to state a claim for relief rather than to the authority of the court to adjudicate the claim. A court properly dismisses a claim for lack of subject matter jurisdiction under Rule 12(b)(1) only when it "lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 416–17 (2d Cir. 2015). Congress has passed the statutes that allow the court to adjudicate Plaintiff's claims under the NYSHRL and NYCHRL. Congress conferred on the district courts original jurisdiction of cases "arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and of cases involving diverse citizens, 28 U.S.C. § 1332. It also gave the district courts supplemental jurisdiction "over all over claims" related to claims within the original jurisdiction of the court such "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. Plaintiff has invoked § 1331 federal-question jurisdiction by pleading federal Title VII and Section 1981 claims and Spotify does not dispute that Plaintiff's NYSHRL and NYCHRL claims form part of the same case or controversy as her federal claims. It follows that the court has subject matter jurisdiction.

The question of the reach of the NYSHRL or the NYCHRL goes at most, then, to territorial jurisdiction—the power of the State to proscribe conduct occurring outside of its borders—rather than to subject matter jurisdiction. "To ask what conduct [the NYCHRL and NYSHRL] reach[] is to ask what conduct [those statutes] prohibit[], which is a merits question." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010). Whether this Court can, as a matter of jurisdiction, hear the case at all "presents an issue quite separate from the question whether the allegations the plaintiff makes entitle him to relief." *Id.* The challenge raises a merits question, in that the impact test goes to what is necessary for a plaintiff "to assert claims under the State and City Human Rights Laws." *Syeed v. Bloomberg L.P.*, 235 N.E.3d 351, 354

13

(N.Y. 2024).  "The impact requirement is thus a substantive limitation on the geographic reach of the respective statutes."  *Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 194 (S.D.N.Y. 2024).  It does not go to the court's "power to hear a case," which is established by other federal statutes.  *Morrison*, 561 U.S. at 254 (quoting *Union Pacific R. Co. v. Locomotive Engineers,* 558 U.S. 67, 81 (2009)).

**B.        Plaintiff's NYCHRL and NYSHRL Do Not State Claims for Relief**

Having established that Defendant's challenge is properly understood as one that the Plaintiff has failed to state a claim upon which relief can be granted, the Court turns to the merits of Defendant's challenge.  To state a claim for relief under the NYSHRL and NYCHRL, Plaintiff must "plea[d] factual content that allows the court to draw the reasonable inference that" there was, in fact, a New York impact.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id*. at 679.  The plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see Mattrixx Inc. v. Siracusano*, 563 U.S. 27, 46 (2011).  This requirement not met by "legal conclusions," *Iqbal*, 556 U.S. at 678, or by the "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Id*.   The court accepts as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff.  *See York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002).

The NYSHRL and NYCHRL are addressed to acts of discrimination either against employees who work respectively in New York State or New York City or the impact of which

14

is felt in New York State or New York City.[2] A "nonresident plaintiff must demonstrate that the alleged discriminatory conduct had an 'impact'" within the state or city to avail herself of the protections of the NYSHRL or NYCHRL. *Hoffman*, 933 N.E.2d at 746; *see Moore v. Johnson & Johnson*, 2025 WL 1866736, at *7 (S.D.N.Y. July 7, 2025) ("New York courts have interpreted the NYCHRL as limiting the applicability of its protections to preventing discrimination within the City," and "[c]ourts apply an 'impact' test to determine whether 'discriminatory conduct had an impact within the City.'"). There are "two ways in which a nonresident may satisfy the impact requirement: (1) working in New York or (2) establishing that the challenged conduct had some impact on the plaintiff within the respective New York geographic boundaries." *Syeed*, 235 N.E.3d at 354; *accord Diaz-Roa v. Hermes Law, P.C.*, 757 F. Supp. 3d 498, 558 (S.D.N.Y. 2024).

To invoke the protection of the NYSHRL or NYCHRL, it is not sufficient that the allegedly discriminatory acts were committed in New York. *See, e.g., Hoffman,* 933 N.E.2d at 745, 748 (NYCHRL does not apply even though termination decision "was made and executed in New York City"); *Mwangi v. Passbase, Inc.*, 2022 WL 2133734, at *8 (S.D.N.Y. June 14, 2022) (dismissing plaintiff's NYCHRL and NYSHRL claims because "even if the [discriminatory] acts themselves occurred in New York, their impact was not felt in New York, because [plaintiff] was at all times in Berlin"). Nor is it enough that a plaintiff has occasionally traveled to New York or had meetings in New York if she did not experience the impact of

---

[2] The New York Court of Appeals in *Hoffman* explained that the NYCHRL is "meant to . . . protect[] . . . those who work in the city," and that the NYSHRL is intended to "protect 'inhabitants' and persons 'within' the state, meaning that those who work in New York fall within the class of persons who may bring discrimination claims in New York." *Hoffman*, 933 N.E.2d at 747; *see also Syeed*, 2353 N.E.3d at 355 (explaining that "*Hoffman* turned on [the NYCHRL and NYSHRL]'s use of the terms 'inhabitants' and persons 'within the state'" to find that the statutes are limited in territorial scope).

15

discrimination while in New York.  *See, e.g.*, *Shiber v. Centerview Partners LLC*, 2022 WL 1173433, at *3 (S.D.N.Y. Apr. 20, 2022); *Pedroza*, 2020 WL 4273988, at *3 (barring NYCHRL claim for nonresident plaintiff who "traveled to New York City twelve times in the last six months of her employment"); *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 865 (S.D.N.Y. 2013) ("simply . . . pointing to frequent communication with a managing office in New York City and meetings there regarding local projects" is insufficient to meet the impact requirement). The only impact of import is the one felt by plaintiff as a result of the discriminatory conduct. *Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174, 183 (2d Cir. 2016) (explaining that "the impact of the employment action must be felt by the plaintiff in [New York]" and not those that plaintiff interacted with in the course of her employment); *Doner-Hendrick v. N.Y. Inst. of Tech.*, 2011 WL 2652460, at *8 (S.D.N.Y. July 6, 2011) (explaining that "[t]he relevant 'impact' within the State that a plaintiff must plead (and later prove) is the direct effect of a discriminatory act on a protected individual—giving rise to a cause of action for that individual—not the attenuated reaction of third parties to such an individual's circumstance").  "[T]he impact of the contested employment action [must have been] felt by [p]laintiffs in New York."  *Meilus v. Rest. Opportunities Ctr. United, Inc.*, 2021 WL 4868557, at *10 (S.D.N.Y. Oct. 15, 2021).

Plaintiff is indisputably a resident of Illinois who "primarily performed work for Spotify in Chicago, Illinois."  Compl. ¶ 2.  She alleges that "Spotify is headquartered in New York" and that its "discriminatory conduct was initiated and implemented" against her in New York, New York.  *Id.* ¶¶ 3, 115.  She alleges that she visited New York on just one occasion in October 2024 to attend Ad Week.  *Id.* ¶ 79.  She also mentions New York with respect to her allegation that in summer 2024, Plaintiff "was excluded from the NA Quarterly Kickoff in person in New York,"

16

while "two non-Black Directors . . . travelled with Mr. Rotunno to the meeting in New York," leaving Plaintiff in Chicago.  *Id.* ¶ 78.

These allegations are insufficient to state a claim under the NYSHRL and NYCHRL. Plaintiff does not allege that she suffered a discriminatory impact during Ad Week in New York—she expressly alleges that she did not find out until "later" that "her team had also been in town for client dinners, happy hours, and networking events."  *Id*. ¶ 79.  Nor does she allege who made the decision not to invite her to those opportunities or that it was the product of discrimination.  Her allegations also cannot support a plausible inference that she felt the impact of the fact that Rotunno brought different directors to meetings in New York, as she was in Chicago at that time.  Plaintiff's failure to plead that she felt any impact of the alleged discrimination in New York is fatal to her New York state law claims—"at most, [Plaintiff] pleaded that [her] employment had a tangential connection to the city and state."  *Hoffman*, 933 N.E.2d at 748; *see also Mwangi*, 2022 WL 2133734, at *8; *Shiber*, 2022 WL 1173433, at *3; *Pedroza*, 2020 WL 4273988, at *3.

Accordingly, Spotify's motion to dismiss Counts Two, Three, and Five is granted.

## II.    Retaliation Claims

Plaintiff's fourth cause of action alleges claims for retaliation under Title VII and Section 1981.  Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  Unlike Title VII, Section 1981 does not contain a specific statutory provision prohibiting retaliation, but the Supreme Court has held that retaliation claims are cognizable under Section 1981.  *CBOCS W., Inc. v. Humphries*, 553 U.S. 442 (2008).  The standard is the same for retaliation claims

17

brought under Title VII and Section 1981.  *See Littlejohn v. City of N.Y.,* 795 F.3d 297, 315 (2d Cir. 2015).

The retaliation claims are analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  "To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions."  *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023).  Stated otherwise, for a retaliation claim to survive a motion to dismiss, the "plaintiff must plausibly allege that: (1) defendants . . . took an adverse employment action . . . against him, (2) because he has opposed any unlawful employment practice," or in other words, engaged in a protected activity.  *Brooks v. Bright Horizons Fam. Sols., Inc.*, 2026 WL 1660493, at *4 (2d Cir. June 9, 2026) (summary order) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015)).

### A.    Protected Activities

In order to establish a retaliation claim, Plaintiff is first required to plausibly allege that she engaged in protected activity.  Plaintiff alleges that she made complaints on ten different occasions: (1) one complaint to HR Specialist Barco in March 2022; (2) four complaints to her supervisor, Rotunno in the period of April 2024 to June 2024; (3) three complaints to HR representative Nelson and US Head of Sales Piper in the period August 2023 to October 2024; and (4) two complaints to her former-manager Mendes in the period of 2022 to March 2023.[3]

---

[3] Plaintiff argues in her opposition, Dkt. No. 17 at 9–10, that she complained to Spotify that her supervisors, including Mikitka, were "treating her adversely compared to her non-Black counterparts and holding [Plaintiff] to disproportionate expectations compared to her non-Black counterparts."  Compl. ¶ 140.  That allegation does not supply any factual context such as who

Spotify argues that only Plaintiff's complaints to Mendes could constitute protected activity[4] and

that (i) her alleged complaint in March 2022 to Barco; (ii) her alleged complaints to Rotunno;

and (iii) her alleged complaints to Nelson and Piper do not constitute protected activity.  Dkt No.

15 at 9–11.

For a complaint to constitute protected activity, it must put the employer on notice that

the plaintiff was complaining about discrimination.  *See Cardwell v. Davis Polk & Wardwell*

*LLP*, 2020 WL 6274826, at *31 (S.D.N.Y. Oct. 24, 2020) ("A plaintiff engages in protected

activity when she 'oppose[s]' discrimination.") (citation omitted); *see also Bamba v. Fenton*, 758

F. App'x 8, 12–13 (2d Cir. 2018) ("the employer must be able to reasonably understand that the

complaint was directed at conduct prohibited by Title VII.").  Plaintiff need not have uttered the

words "race" or "discrimination" *in haec verba* for her complaint to constitute protected activity.

*Brooks*, 2026 WL 1660493, at *4; *Trotter*, 737 F. Supp. 3d at 187; *Moore v. Hadestown*

*Broadway Ltd. Co.*, 722 F. Supp. 3d 229, 254 (S.D.N.Y. 2024).  It is sufficient that a reasonable

employer would understand that the conduct of which the plaintiff complained constituted or

might constitute discrimination.  *Cardwell*, 2020 WL 6274826, at *31; *Bamba*, 758 F. App'x at

12–13; *McSweeney v. Cohen*, 776 F. Supp. 3d 200, 251 (S.D.N.Y. 2025).

At the same time, however, "[c]omplaining about general unfairness, unaccompanied by

any indication that plaintiff's protected class status caused the unfairness, does not qualify as

---

Plaintiff complained to, when she complained, and what the adverse treatment consisted of.
Accordingly, ¶ 140 does not plausibly allege an additional instance of protected activity.
[4] On an unspecified date prior to 2023, Plaintiff shared with Mendes that Plaintiff's non-Black
colleagues routinely ignored her and other Black employees, creating a hostile and isolating
work environment.  Compl. ¶ 73.  In March 2023, Plaintiff notified Mendes that Rotunno
excluded her and another Black peer from meetings with other sales leaders, including a client
dinner at the SXSW Conference, and noted that she believed it was intentional and motivated by
race.  *Id.* ¶¶ 74–75.  Spotify does not dispute that these complaints constitute protected activity.

protected activity." *Batiste v. City Univ. of New York*, 2017 WL 2912525, at *10 (S.D.N.Y. July 7, 2017) (citing *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107–08 (2d Cir. 2011)); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007) (observing that, while no magic words are required, "ambiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity"). Even the use of words like discrimination are not necessarily sufficient "if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory." *Brooks*, 2026 WL 1660493, at *4 (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 17 (2d Cir. 2013)).

In making a protected complaint, a Plaintiff "need not establish that the conduct she opposed was actually a violation of [these laws]." *Summa v. Hofstra Univ.*, 708 F.3d 115, 126 (2d Cir. 2013). "An employee's complaint may qualify as protected activity, satisfying [this] element of this test, so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 46 (2d Cir. 2025) (citing *Kelly*, 716 F.3d at 14).

### 1. Complaint to Barco

Plaintiff's March 2022 complaint to HR Specialist Barco does not constitute protected activity. Plaintiff alleges that after she was uninvited from a client meeting by a non-Black colleague "who consistently engaged in insubordinate and exclusionary behavior," she reported the incident to Barco. Compl. ¶ 55. She alleges nothing more about the incident or the subsequent report. Construing the allegation liberally, the Court assumes that Plaintiff reported to Barco (i) that the colleague engaged in insubordinate and exclusionary behavior and (ii) had uninvited her to a client meeting. That report, however, would not be reasonably sufficient to put the employer on notice that Plaintiff was complaining about discrimination. Simply

20

complaining that you have been excluded from a client meeting or that a fellow employee has engaged in disrespectful behavior says nothing about the cause of that behavior.  It could be that Plaintiff was excluded because she was not needed for the meeting or because her colleague simply did not like her.

It does not add enough that Plaintiff identifies as Black and the person whom she complained about was non-Black.  The law does not indulge the presumption that every adverse decision made with respect to a person of a different protected characteristic is a decision made on the basis of such protected characteristic: "liability depends on whether the protected trait actually motivated the employer's decision."  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993); *see Rommage v. MTA Long Island R.R.*, 2010 WL 4038754, at *14 (E.D.N.Y. Sept. 30, 2010), *aff'd*, 452 F. App'x 70 (2d Cir. 2012) (summary order) ("The mere fact that the person or people making the complaints [were] African American will not convert an ordinary complaint into a complaint of racial discrimination sufficient to put the employer on notice of such discrimination." (internal citation and quotation marks omitted)); *Reach v. Healthfirst, Inc.*, 2026 WL 1802838, at *10 (S.D.N.Y. June 23, 2026).  There is nothing in either the content or the context of the statement that would have put Spotify on notice that Plaintiff was making a complaint about race.  *See McDonald v. Pharney Grp. LLC*, 2026 WL 787750, at *8 (S.D.N.Y. Mar. 20, 2026) (finding a complaint was not protected activity where she "said nothing that could be understood, even in context, to be about her race.") (cleaned up).

### 2.  Complaints to Rotunno

Plaintiff alleges that she made complaints to her supervisor Rotunno on several separate occasions, but only one of those complaints constitutes protected activity.  First, after Plaintiff was assigned the underdeveloped and more challenging business accounts within the CPG food group while Rosenow was assigned mature well-developed business accounts, Plaintiff

21

complained to Rotunno that the proposed joint goal setting arrangement would disproportionally disadvantage her and her team as compared to Rosenow.  Compl. ¶¶ 26, 28–29.  Rotunno dismissed the concerns and assured Plaintiff that Rosenow would likely be fair about the arrangement.  *Id.* ¶ 29.

Second, on another occasion, Plaintiff complained to Rotunno about his decision to give one of Plaintiff's most successful accounts to Rosenow and implored him to reconsider.  *Id.* ¶¶ 36, 38.  Rotunno ignored Plaintiff's concern, "finalized the transfer of the account to Mr. Rosenow, and further expanded the gap in revenue generation potential between [Plaintiff] and her non-Black counterpart."  *Id.* ¶ 38.

Third, in June 2024, Plaintiff raised concerns with Rotunno about insubordinate and unprofessional conduct by two of her non-Black reports, including that in one instance the direct report held a meeting with other sellers to advise them not to "go along" with anything said by Plaintiff and in another instance the direct report "excluded her from client meetings and also refused to inform her about important client and account information."  *Id.* ¶¶ 60–61.  Rotunno did not intervene in either instance and instead reinforced the exclusionary atmosphere by holding meetings with Plaintiff's direct report without including Plaintiff.  *Id.* ¶¶ 60–62.

With respect to these three complaints, the Second Circuit's recent summary order in *Brooks* is on point.  There, the plaintiff, who identified as a Black woman, alleged that she was suspended from work, placed on unpaid administrative leave, and ultimately fired after she complained to her supervisor that a direct report who was white earned a higher salary than she did despite holding a more junior position and that she felt underappreciated and demeaned by her immediate supervisor.  *Brooks*, 2026 WL 1660493, at *3.  The Circuit held that the plaintiff's complaints were insufficient to inform her employer of her protected activity.  *Id.* at *4.  The

22

plaintiff merely informed her employer that a white woman received a higher salary than plaintiff did despite being in a more junior position. "Because nothing in the substance of [the plaintiff's] complaint . . . suggested that her concerns about her compensation were actually complaints of unlawful discrimination, [the plaintiff] f[ell] short of pleading that [the defendant] was aware that she had engaged in a protected activity." *Id*.

Similarly, Plaintiff here alleges nothing more about the assignments other than that she was given more challenging accounts and that one of her most successful accounts was reassigned, making it more difficult for her to hit her revenue targets. Plaintiff also does not allege she discussed Rosenow's race with Rotunno, nor does she allege any facts concerning Rosenow's qualifications, performance, or skill level. Rather, Plaintiff alleges only that she informed Rotunno she was being held to unfair standards as compared to a colleague at the same level. Such a complaint, standing alone, could be attributable to any number of non-discriminatory reasons. Nothing in the substance of Plaintiff's complaint would have placed Spotify on notice that she was complaining of unlawful discrimination. *See id*.

Plaintiff's fourth complaint to Rotunno, however, plausibly constitutes protected activity. Plaintiff alleges that she communicated to Rotunno her concerns that her direct reports had engaged in a pattern of unaddressed insubordination and that they were "resistant to her leadership from the outset as a result of a negative rumor mill Spotify allowed to fester regarding [her] leadership capacity." Compl. ¶ 58. Plaintiff alleges that Rotunno "admitted that the new CPG team had reservations about working with [Plaintiff] based on racially stereotypical rumors that [Plaintiff] was difficult to work with." *Id.* ¶ 59. The thrust of the allegation is that Rotunno understood, based on Plaintiff's description, that the conduct to which Plaintiff was subject was the product of discrimination on the basis of race—he "admitted" that the team had reservations

on the basis of racially stereotypical rumors.  That is enough to show that he would "reasonably understand" that the complaint was "about unlawful discrimination."  *Moore*, 722 F. Supp. 3d at 255 (quoting *Cardwell*, 2020 WL 6274826, at *31); *see Pinner v. Mortg. Bankers, Ltd.*, 169 F. App'x 599, 600 (2d Cir. 2006) (summary order) (finding it clear that the supervisor "would understand her complaints about that situation as complaints about sexual harassment" where the boss "effectively admitted as much").

The retaliation provisions of Title VII and Section 1981 are intended to encourage employees to report conduct that is the product of race discrimination so that the employer can remediate.  *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (finding that the anti-retaliation provision is intended to function "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of Title VII's basic guarantees."); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints . . . [and] interpreting the antiretaliation provision to provide broad protection for retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends."); *cf. Setelius v. Nat'l Grid Elec. Servs. LLC*, 2014 WL 4773975, at *28 (E.D.N.Y. Sept. 24, 2014) ("Title VII is designed to prevent and remediate discriminatory conduct in the workplace.").  It follows that an employee may not retaliate against an employee who makes a complaint that the employer understands to be about discrimination.  To hold otherwise would undermine the very mechanisms that are intended to rid the workplace of invidious discrimination.  Because Rotunno understood that Plaintiff's complaint implicated conduct prohibited by Title VII, the complaint constitutes protected activity.

### 3. Complaints to Nelson and Piper

Plaintiff's complaints to Nelson and Piper do not constitute protected activity. In August 2023, Plaintiff complained to Nelson, an HR representative, that two of her direct reports, Snyder and Brennan, had engaged in insubordination. Compl. ¶ 56. Snyder deliberately excluded Plaintiff from key client meetings, routinely omitted crucial deal stage details from her weekly reports, and, when Plaintiff attempted to support Snyder in improving her performance and complying with Spotify's companywide sales mandates, Snyder dismissed Plaintiff's guidance and responded in a dismissive tone despite meeting with Plaintiff one-on-one. *Id.* ¶¶ 50–51. Plaintiff never witnessed Snyder, or her other direct reports, speak to non-Black Directors in such a condescending manner. *Id.* ¶ 52. Similarly, Brennan openly disregarded Spotify's protocols and Plaintiff's direct instruction by continuing to send lengthy, data-heavy emails to clients instead of using the company-wide presentation-style proposal framework. *Id.* ¶ 53. Despite Plaintiff's complaints, Nelson did nothing to ensure that Plaintiff's direct reports respected her authority and heeded her directives as their supervisor. *Id.* ¶ 56. When Rotunno failed to intervene during the June 2024 complaints regarding her subordinates, Plaintiff raised her complaint about her team dynamics to Piper, US Head of Sales, noting that Rotunno refused to support her. *Id.* ¶ 65. Piper said she would follow up with Rotunno, but Plaintiff never witnessed any improvement to the team dynamic. *Id.* In October 2024, Plaintiff further escalated her complaints regarding her team's insubordination to Nelson. *Id.* ¶ 66.

Plaintiff has not plausibly alleged that the Spotify employees would have understood these complaints to rest on unlawful racial discrimination. Alone, it is not unlawful for a subordinate to disrespect a superior even if the subordinate identifies as a member of a different race than the superior. And it is not enough to put an employer on notice of race discrimination for the superior to complain that the subordinates are disrespecting her. In the workplace, there

25

may be many reasons other than race why a subordinate might not get along with a superior. *See Rommage*, 2010 WL 4038754, at *14 ("there is no reason to impute to defendant any consciousness of an unstated rac[ial] . . . premise underlying the conduct described.").

### B.      Materially Adverse Employment Actions

A retaliation claim can stand only where the protected activity is followed by a materially adverse employment action. Spotify does not dispute that Plaintiff's termination plainly constitutes an adverse employment action for the purposes of Title VII, *see Vega*, 801 F.3d at 85, but argues that termination is the only adverse employment action here. Plaintiff argues instead that (i) being told to "consider finding another job," (ii) being excluded from the NA Kickoff, (iii) being excluded from events during Ad Week, and (iv) being given worse account assignments than non-Black colleagues all constitute adverse employment actions.

To plausibly allege an adverse employment action in the context of a retaliation claim, a plaintiff need not allege that the adverse action "alter[ed] the terms and conditions of [her] employment," but rather only that "the retaliatory actions she was subjected to were materially adverse, meaning that the actions 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Carr*, 76 F.4th at 180 (quoting *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68); *see also Muldrow v. City of St. Louis*, 601 U.S. 346, 357 (2024) (reiterating that the "materially adverse" standard applies to Title VII retaliation claims). "[T]he alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently substantial in gross as to be actionable." *Hicks*, 593 F.3d at 165 (cleaned up). The Second Circuit has called these "retaliatory hostile work environment" claims. *Dawson v. Beebe*, 2025 WL 2402289, at *6 (S.D.N.Y. Aug. 19, 2025) ("A claim of 'retaliatory hostile work environment' must therefore be treated identically to a claim

26

that an employer took multiple retaliatory actions that were, in the aggregate, 'materially adverse.'" (citing *Carr*, 76 F.4th at 180)).

Plaintiff first asserts that Spotify retaliated against her when, after she raised her discrimination concerns with Spotify's HR department, HR's response was that she should "consider finding another job." Dkt. No. 17 at 11; Compl. ¶ 67. First, the Court has already determined that Plaintiff's complaint to Nelson was not a protected activity, which alone precludes recovery under Title VII or Section 1981 with respect to any action that allegedly followed therefrom. In any event, an employer can suggest that an employee consider other employment without running afoul of the non-retaliation provisions of Title VII and Section 1981. The Second Circuit has noted that "criticism of an employee [alone] . . . is not an adverse employment action" for retaliation or disparate treatment purposes. *Perez v. N.Y. & Presbyterian Hosp.*, 2009 WL 3634038, at *15 (S.D.N.Y. Nov. 3, 2009) (citing *Weeks v. New York State*, 273 F.3d 76, 86 (2d Cir. 2001)); *Jones v. Brookhaven Sci. Assocs., LLC*, 2024 WL 4145777, at *15 (E.D.N.Y. Sept. 10, 2024) ("an employer's criticism of an employee's work, without more, does not constitute an adverse employment action"). Further, "[v]erbal abuse by itself is typically insufficient to constitute an adverse employment action for Title VII purposes because 'negative or otherwise insulting statements are hardly even actions, let alone adverse actions.'" *Baker v. City of N.Y., Fire Dep't*, 2025 WL 2774181, at *10 (S.D.N.Y. Sept. 29, 2025) (quoting *Scott v. City of N.Y. Dep't of Corr.*, 641 F. Supp. 2d 211, 231 (S.D.N.Y. 2009) (cleaned up)); *accord Muniz v. City of New York*, 2023 WL 6294169, at *8 (S.D.N.Y. Sept. 27, 2023). If criticism is not an adverse employment action, then it follows that a comment about finding another job—which may be experienced in the same way as criticism—does not constitute an adverse employment action.

27

Even if Plaintiff perceived the comment to be more than criticism, courts in this Circuit have held that threats of adverse action alone do not constitute an adverse employment action. *See Tompkins v. Allied Barton Sec. Servs.*, 2010 WL 3582627 at \*5 n.6 (S.D.N.Y. Aug. 2, 2010), *report and recommendation adopted*, 2010 WL 3582621 (S.D.N.Y. Sept. 13, 2010), *aff'd*, 424 F. App'x 42 (2d Cir. 2011) (summary order); *Bowles v. N.Y.C. Transit Auth.*, 2006 WL 1418602, at \*10 (S.D.N.Y. May 23, 2006) (collecting cases and noting that "[i]n this Circuit, most courts that have faced the issue have decided that an unrealized threat of discipline or termination is not actionable under Title VII."); *see also Franco v. City of New York*, 2025 WL 964014, at \*12 (E.D.N.Y. Mar. 31, 2025) ("Indeed, even verbal threats of termination or retaliation do not constitute materially adverse employment actions." (citing *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 571 (2d Cir. 2011)).  The alleged statement from HR that Plaintiff should consider finding a new job did not even amount to a threat of termination.  It thus does not rise to the level of an adverse employment action.

Plaintiff next asserts that she was retaliated against in Summer 2024, after she had lodged her complaints with HR, because Spotify excluded her from the NA Quarterly Kickoff in New York.  Dkt. No. 17 at 11; Compl. ¶ 78.[5]  Again, Plaintiff has not plausibly alleged that the complaints to HR were protected activity.  Assuming they were, as a general matter "exclusion from meetings, failing to be included on emails, and increased scrutiny do not amount to adverse employment actions."  *Kirkland-Hudson v. Mount Vernon City School Dist.*, 665 F. Supp. 3d 412, 461 (S.D.N.Y. 2023) (citing *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007)); *see also Wallace v. N.Y. State Dep't of Corr. Servs.*, 2006 WL 2134644, at \*9 (W.D.N.Y. July 28, 2006)

---

[5] It is unclear from the complaint and Plaintiff's opposition what "complaints with HR" refers to. The most recent complaint to HR alleged by Plaintiff that preceded the summer of 2024 was made to Nelson in August 2023.  Compl. ¶ 56.

(allegations that plaintiff was "completely ostracized and excluded from important meetings and social events" not sufficient to establish adverse action) (citation omitted)).  Courts have recognized that exclusion from certain meetings can be considered adverse employment actions in limited circumstances.  For example, in *Borrero v. American Exp. Bank Ltd.*, the plaintiff claimed that the defendant retaliated against her by "denying her travel request to Peru, excluding her from client meetings, cancelling her Bloomberg account, and giving her negative performance ratings."  533 F. Supp. 2d 429, 441 (S.D.N.Y. 2008).  The court reasoned that "a request to take a business trip or exclusion from client meetings may make little difference to some workers but may matter enormously in a business where compensation is tied to an individual employee's sales revenue, which, in turn, may depend on direct interaction with clients."  *Id*.

Here, however, Plaintiff does not allege that she made a specific request to attend the NA Quarterly Kickoff trip and does not allege she missed an opportunity for client interaction as a result of non-attendance.  Therefore, her exclusion from that trip does not constitute an adverse employment action.

Plaintiff's allegations with respect to Ad Week, however, are sufficient at this stage.  Plaintiff has specifically alleged that the exclusion from "client dinners, happy hours, and networking events" at Ad Week "deprived her of crucial networking opportunities" and "affected [her] ability to successfully perform her job."  Compl. ¶¶ 79–81.  It is plausible that in the context where, as alleged, Plaintiff's success as a salesperson was tied to her individual sales, that "exclusion from client meetings . . . may matter enormously."  *Borrero*, 533 F. Supp. 2d at 441; *see also Kamrass v. Jefferies LLC*, 2020 WL 6807352, at *6 (S.D.N.Y. Nov. 19, 2020) ("Plaintiff's exclusion from client and networking events qualifies as a materially adverse

change," because "such events present an opportunity for salespeople to develop client relationships, meet new prospects, and expand their book of business."); *contra Betterson v. HSBC Bank USA, N.A.*, 661 F. App'x 87, 89 (2d Cir. 2016) (summary order) (finding that "exclusion from certain meetings is not an adverse employment action" where she "admits that she could still do her job and there is no evidence that she was disadvantaged by the exclusion."). For a salesperson, exclusion from meetings from which business could be generated is something that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega*, 801 F.3d at 90 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

Finally, Plaintiff also points to worsening account assignments as a materially adverse employment action. Dkt. No. 17 at 13; Compl. ¶¶ 26, 36-38. "A reasonable worker could be dissuaded from speaking up against the discrimination they were experiencing if they thought that their supervisor was going to change their job responsibilities." *Friederick v. Passfeed, Inc.*, 2022 WL 992798, at *7 (S.D.N.Y. Mar. 31, 2022) (holding that the reassignment of one of the plaintiff's projects to another teammate constituted an adverse employment action); *see also Kamrass*, 2020 WL 6807352, at *6 (decision to change Plaintiff's sales territory plausibly stated a materially adverse employment action). Moreover, such a change may be sufficient to allege a *prima facie* case of retaliation even if it "did not affect" the Plaintiff's "wages or benefits" where it results in "significantly diminished material responsibilities." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008); *see Buon v. Spindler*, 65 F.4th 64, 80 (2d Cir. 2023). The assignment of worse accounts may therefore constitute a materially adverse employment action.[6]

---

[6] Although a series of otherwise minor acts may, when viewed in the aggregate, constitute a materially adverse employment action, *see Ziparo v. CSX Transp., Inc.*, 160 F.4th 314, 341 (2d Cir. 2025), those acts must follow from a protected activity. Plaintiff states that the four alleged

For the reasons above, Plaintiff has alleged three plausible material adverse employment actions, which are her termination, exclusion from Ad Week, and her worsening account assignments.

## C.      Causal Connection

The Court next addresses whether Plaintiff has plausibly alleged a causal connection between the complaints the Court has found to be protected activities and those actions the Court has determined to be materially adverse employment actions.  "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . requir[ing] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Bamba*, 2024 WL 3924810 at *13 (quoting *Univ. of Tx. Sw. Med. Cntr. v. Nassar*, 570 U.S. 338, 360 (2013)); *Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023). "Causation can be established either directly through evidence of retaliatory animus or indirectly by demonstrating that the adverse employment action followed quickly on the heels of the protected activity or through other evidence such as disparate treatment of fellow employees."  *Massaro v. N.Y. City Dep't of Educ.*, 2022 WL 1788203, at *2 (2d Cir. June 2, 2022) (summary order), *cert. denied*, 143 S. Ct. 372 (2022); *see Colon v. NYC Housing Auth.*, 2021 WL 2159758, at *13 (S.D.N.Y. May 26, 2021).  "But-for causation does not, however, require proof that retaliation was the only cause of the employer's action, but only that the

---

materially adverse actions (in addition to termination) all followed her "2024 HR complaints." Dkt. No. 17 at 12.  The only HR complaint Plaintiff made in 2024 was her October 2024 complaint to Nelson, which was not protected activity.  Even assuming it was, only the alleged "consider finding another job" comment and the exclusion from events during Ad Week occurred subsequent to that date.  The Court has already determined that the exclusion from Ad Week events could be a materially adverse employment action, and the addition of the non-actionable statement that Plaintiff should "consider finding another job" adds no additional context and is not merely by its proximity to Ad Week transform it into a viable adverse employment action.

adverse action would not have occurred in the absence of the retaliatory motive." *Richards v. Dep't of Educ. of City of N.Y.*, 2022 WL 329226, at *16 (S.D.N.Y. Feb. 2, 2022) (quoting *Vega*, 801 F.3d at 91).

### 1.    Termination

Spotify argues that Plaintiff does not plausibly allege that her termination was causally connected to any protected activity. Dkt. No. 15 at 11–13. The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Summa*, 708 F.3d at 128 (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)). "This has allowed [the Circuit] to exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.* (quoting *Espinal*, 558 F.3d at 129). Where a plaintiff relies on temporal evidence alone, the Second Circuit has "held that a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action." *Banks v. General Motors*, 81 F.4th 242, 277 (2d Cir. 2023). But "[w]here temporal proximity is not the only evidence that bears on a causal connection, we have recognized that the lapse in time between the protected activity and adverse action can be longer." *Id.* at 277– 78 (citing cases). That is, where a longer period of time has elapsed, "other supporting factual allegations," i.e., "surrounding circumstances," may still be "sufficient to allow an inference of causation." *Siclari*, 2020 WL 7028870, at *9.

One factual setting in which courts have recognized that causation may still be inferred despite a relatively long gap in time between the protected activity and the alleged retaliatory action is when there is evidence that defendants "waited to exact their retaliation at an opportune time." *Espinal*, 558 F.3d at 129. In *Espinal*, the Second Circuit found that "the passage of only

six months between the [protected activity] and an allegedly retaliatory beating by officers . . . is sufficient to support an inference of a causal connection" where it was "plausible that the officers waited to exact their retaliation at an opportune time—as when Espinal was involved in a fight with another inmate—in order to have a ready explanation for any injuries suffered by Espinal." *Id*.  In *Summa*, the Second Circuit similarly found a causal nexus where four months had elapsed between the protected activity and the adverse action but the action was taken "at the first actual opportunity to retaliate." 708 F.3d at 128.  In that case, the plaintiff's protected activity occurred on the last day of the fall football season in 2006, and the plaintiff was denied the position as football manager a few days prior to the start of the spring football season in 2007.  *Id*.  Relying on *Summa*, the Second Circuit in *Edelman* held that despite a year-long delay between protected activity and non-renewal of an employment contract, causation could be inferred from the fact that the plaintiff suffered adverse consequences "at the first actual opportunity to retaliate."  141 F.4th at 51 (quoting *Summa*, 708 F.3d at 128).

Spotify terminated Plaintiff's employment in January 2025, just under two years after the Mendes complaints and about nine months after the Rotunno complaint.  Compl. ¶ 143.[7]  That gap in time is far too long for Plaintiff to plausibly allege an inference of causation on the basis of timing alone.  Plaintiff does not provide any direct evidence that termination was retaliatory.  Nor has Plaintiff plausibly alleged any strategic or seasonal timing of the termination such that the extended period between the complaints and her termination would not be dispositive.  Plaintiff fails to allege a sufficient causal connection between the protected activity and her termination.

---

[7] The complaint alleges Plaintiff communicated concerns to Rotunno "early on" when she transitioned to the CPG team.  Compl. ¶ 58–59.  The Court construes therefore that this occurred around April 2024, when Plaintiff transitioned to the CPG group.  *Id.* ¶ 25.

### 2.   Exclusion from Ad Week

Plaintiff similarly fails to allege a but-for causal connection between her exclusion from networking opportunities at Ad Week and  any protected activity.  Plaintiff alleges that she was excluded from Ad Week meetings in October of 2024.  This is temporally removed from both Plaintiff's protected complaint to Mendes in March 2023, *id.* ¶ 75, and from her April 2024 complaint to Rotunno, *id.* ¶ 59.  Plaintiff includes no other allegations that would, despite the lengthy delay between the alleged protected activity and retaliatory action, create a plausible inference of causation.

### 3.   Worsening Account Assignments

Plaintiff also fails to plausibly allege a causal connection between any protected activity and the worsening account assignments.  Plaintiff alleges that after transitioning to the CPG group, she was assigned underdeveloped and more challenging business accounts and that she complained to Rotunno "early on" that her direct reports were resistant to her leadership due to rumors regarding her leadership capacity.  *Id.* ¶¶ 25–26, 58–59.  But the complaint contains no factual allegations supporting the inference that the account assignments were made because Plaintiff engaged in protected activity.  First, Plaintiff alleges that she was assigned "distressed client accounts and smaller, less profitable sales territories" in advance of her transition to the CPG group, "shortly after" her move to Sales Director in 2021 (that is, prior to her complaints to both Mendes and Rotunno).  *Id.* ¶¶ 17, 20–24.  Where the action "followed 'gradual adverse job actions that began well before the plaintiff engaged in any protected activity,'" temporal proximity "cannot support an inference of causation, even at the pleading stage." *Eugene v. City of New York*, 2026 WL 1831351, at *15 (S.D.N.Y. June 25, 2026) (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)).  Second, the alleged changes that

followed Plaintiff's transition to the CPG group are not alleged to have followed her complaint to Rotunno.

Nor does Plaintiff plausibly connect the assignments to her earlier complaints to Mendes. The complaint does not allege that Rotunno knew of Plaintiff's complaints to Mendes, and the approximately one-year gap between the Mendes complaints and the challenged assignments further undermines any inference of causation.  Likewise, Plaintiff does not allege facts connecting the loss of her most successful account to any protected activity.  Compl. ¶ 36.[8]

Accordingly, Plaintiff fails to plausibly allege that the worsening account assignments or loss of an account were caused by protected activity.  Absent pleadings that plausibly suggest any causation between the protected activity and the alleged adverse employment actions, Plaintiff's Title VII and Section 1981 retaliation claims must be dismissed.

## III.    Timeliness for Disparate Treatment Claim (Title VII)[9]

Spotify also moves to dismiss Plaintiff's Title VII disparate treatment claim (Count One) to the extent it is predicated on actions that fall outside the applicable statute of limitations.  Dkt. No. 15 at 1.  Spotify does not otherwise move to dismiss Plaintiff's disparate treatment claim.

Plaintiffs asserting Title VII claims must file a complaint with the EEOC or an equivalent state agency within 300 days of the allegedly discriminatory action.  *See* 42 U.S.C. § 2000e-5(e)(1); *Gindi v. N.Y.C. Dep't of Educ.*, 786 F. App'x 280, 282 (2d Cir. 2019) (summary order); *Vega*, 801 F.3d at 78–79 ("Title VII requires that individuals aggrieved by acts of discrimination file a charge with the EEOC within 180 or, in states like New York that have local administrative mechanisms for pursuing discrimination claims, 300 days after the alleged unlawful employment

---

[8] Plaintiff does not allege the timing of when the Sazerac account was taken from her.  Compl. ¶ 36.  In context, it might have occurred in Q4 of 2024.

[9] Spotify does not dispute the timeliness of the Section 1981 claim, which has a four-year limitations period.  *Banks*, 81 F.4th at 260.

practice occurred." (internal quotation marks omitted)).  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 (2002).  "Each discrete discriminatory act starts a new clock for filing charges alleging that act."  *Id.*; *see Richards*, 2022 WL 329226, at *6.  "Timeliness is measured from the date that the employee receives notice of the discriminatory decision."  *Walker v. Linklaters LLP*, 948 F. Supp. 2d 396, 399 (S.D.N.Y. 2013) (citing *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996)).

Plaintiff filed a charge of race-based discrimination and retaliation with the EEOC on February 12, 2025.  Compl. ¶¶ 8, 82–84.  Accordingly, only incidents that occurred on or after April 18, 2024—300 days before the filing of the EEOC charge—are independently actionable under Title VII.[10]

## IV.    Leave to Amend

The Federal Rules of Civil Procedure provide that "leave to amend a pleading should be freely granted 'when justice so requires.'"  *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016); Fed. R. Civ. P. 15.  Although Plaintiff has not, by separate motion, moved to amend the Complaint, she has requested leave to amend in her opposition to the motion to dismiss.  That is sufficient.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015).  "When a motion to dismiss is granted, the usual practice is to

---

[10] Although they cannot be considered as independent acts upon which a claim of disparate treatment may stand, any acts pre-dating April 18, 2024 "may still 'provide relevant background evidence to any timely claims.'"  *Bernstein v. N.Y.C. Dep't of Ed.*, 2021 WL 4429318, at *5 (S.D.N.Y. Sept. 27, 2021) (quoting *Vega*, 801 F.3d at 88); *see also Davis-Garrett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) ("[E]ven with respect to a claim of discrete discriminatory or retaliatory acts, expiration of limitations period does not bar 'an employee from using the prior acts as background evidence in support of a timely claim.'" (quoting *Morgan*, 536 U.S. at 105)); *Harewood v. N.Y.C. Dep't of Ed.*, 2019 WL 3042486, at *4 (S.D.N.Y. May 8, 2019) ("[D]iscrete acts of discrimination that occurred outside the 300-day period [still] . . . provide relevant background evidence to any timely claims.").

grant leave to amend the complaint." *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); *Soward v. Deutsche Bank AG*, 814 F. Supp. 2d 272, 285 (S.D.N.Y. 2011).  Leave to amend should be denied only if the party seeking amendment has unduly delayed the proceedings or otherwise acted in bad faith, the opposing party will be unfairly prejudiced if leave is granted, or the proposed amendment is futile. *Agerbrink*, 155 F. Supp. 3d at 452; *see also Oliver v. Rio Acquisition Partners, LLC*, 2019 WL 801952, at *4 (S.D.N.Y. Feb. 21, 2019). The Court finds that there is no bad faith on behalf of Plaintiff, that Defendant would not be prejudiced by the grant of leave to amend, and that an amendment would not necessarily be futile.  Plaintiff's request for leave to amend is granted.

**CONCLUSION**

Spotify's motion to dismiss Counts Two, Three, Four, and Five for failure to state a claim is GRANTED, without prejudice to repleading.  Plaintiff has leave to file an amended complaint limited to addressing the flaws identified in this Opinion and Order within 20 days.  The Clerk of Court is respectfully directed to close Dkt. No. 14.

SO ORDERED.

Dated: July 8, 2026
      New York, New York

                                      LEWIS J.  LIMAN
                            United States District Judge